The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. I'd like to offer the apologies of the court for being a little bit late in starting the second argument this morning. We had some technical difficulties in our first one. We hope we've got them resolved so we don't have them in this one. And this is number 4221032 People v. Bledsoe. For the appellant, we have Daniel O'Brien appearing and appearing for the appellee, Connor Gettin. Mr. O'Brien, you may proceed with your argument. Thank you. May it please the court, I am Daniel O'Brien with the Office of the State Appellate Defender and I'm representing Daniel Bledsoe. This case is about reasonable inferences, or put another way, just how attenuated an inference can be and still constitute proof beyond a reasonable doubt. Daniel Bledsoe was found guilty after a stipulated bench trial of felony resisting a peace officer, which includes the element that he knew that the person in question was a police officer. The evidence in trial consisted solely of a two-page stipulation, three photographs of Officer Clouston, and a gun that was taken from Daniel's person. The stipulation itself makes no mention of Daniel's knowledge that Clouston was a police officer, nor does it explicitly reference any facts that would directly suggest such knowledge. For example, it doesn't mention, it doesn't say that the officers were in uniform, that they were in a squad car, that there were sirens, emergency lights, that they identified themselves as police officers. And in this regard, it should be noted that the state's summary of the facts on the first page of their brief does not actually come from the stipulation that was the evidence at trial, but suppression hearing that occurred weeks or months earlier and was not evidence of trial. So any conclusion about Daniel's knowledge has to come from the little bit of information that we have in the stipulation itself. The closest thing to direct evidence that the state produces is a photograph of Officer Clouston, particularly the photograph that shows him in police uniform and says that that's a fair and accurate photograph of his injury. There's no indication of what time this picture was taken, there's no timestamp, there's no reference in the stipulation to this. So, and because it's presented as simply evidence of his injury and not of anything else, it doesn't follow from that that Clouston is in the same clothes that he was in when the incident occurred. It could just as easily have been taken at another time after he got back to the station, hours later, even the next day, on a different shift. The state insists that the statement that the officers were dispatched shows that they were in duty and on uniform, and that the cut is actively bleeding and this these proposals each call for inference upon inference or put matters in evidence that aren't in evidence. The stipulation doesn't say anything about Clouston and Stone's duties, what their titles or responsibilities were. It doesn't say that they're patrol officers or what their particular responsibilities were that morning. The state assumes they're patrol officers. The state assumes that if they're patrol officers, they must be in uniform, but neither of these facts has actually provided us. The claim that the wound is actively bleeding is dubious. There's no blood evident in the photograph of the wound. The state calls it fresh and says that there's no signs of it healing, but both of these statements are conclusory. Both of them call for information that we're not privy to. Essentially, they're medical conclusions. We don't know what exactly happened to Officer Clouston's knee, what it looked like a short while later, or later that day, or after being re-aggravated, or after beginning to heal. The conclusion that Clouston and Stone were in uniform rests on unstated premises, in short, assumptions. It doesn't follow from the information we have. If they haven't shown that he's in uniform, they have failed to meet their burden because there's nothing else to suggest that Bledsoe would have known that they were police officers. Again, there's no sirens, no car, no identification as police officers. If you don't have them being in uniform, you have Daniel being grabbed from behind by two strangers telling him to stop at five o'clock in the morning. Excellent argument, counsel. Do we have to ignore common sense? There's no indication of any witnesses, anyone stating that they were not in uniform, things of that nature. That may have been an issue had it been the case. Reasonable to argue, isn't it? I think it is reasonable to, again, perhaps assume that they may have been in uniform. Again, we have to look at the fact that it's the state's burden to produce the evidence. They failed to produce any particular evidence demonstrating that he was in uniform at the time. It's not implausible that he was in uniform, but it hasn't been proven beyond a reasonable doubt. Even if the court finds that it's a reasonable inference that the officers were in uniform, there's no evidence that Daniel observed the officers before they grabbed him. The case is cited in Daniel's brief where the courts did find proof beyond a reasonable doubt of the knowledge factor, looks what a reasonable inference, I'm sorry, shows what a reasonable inference would look like in this case. People be sorrels. This court found it significant that Officer Brace was in his police uniform, driving a squad car and acting in his official capacity, and that the defendant ran after being ordered to stop, which is different than the facts that we have here. And he stated that he ran because he was afraid he would be shot. Well, the facts that we have here include the fact that the defendant did react to the police presence. I mean, he put his arms, I guess, close to his side, he felt his waistband, and then right after that, I believe it was Stone, Officer Stone called out 1032, which meant that there was probably a weapon on the defendant. So we have that to add to this. To the other pieces of evidence that you articulated in your opening remarks, the photos showing some sort of bleeding from a wound, the 1032, also Officer Klausten testified that he attempted, or they were attempting to handcuff the defendant as well. I mean, the totality of the circumstances certainly can point to sufficient evidence from which the judge could make that inference. Isn't that correct? I think that at a certain point, no doubt, Daniel Bledsoe became aware that these were police officers, obviously, after he was arrested, put in a squad car and so on. But I think that the question is whether or not the alleged conduct occurred before he knew this. So the behavior of grabbing his waistband, I think is only really probative here. If you start with the assumption that he saw the officers, and this was a reaction to him. Other than that, we don't have a description of behavior here that is particularly, or really at all unusual, or suspicious. It is simply, that's something that the officers appear to be suggesting that he was reacting to them. But that is not stated in the stipulation. So that's yet another inference, or yet another step in this whole process that has to be drawn. As far as the 1032, I believe that occurred after they'd already grabbed him, and he'd already pulled away from Officer Klausten. So I believe that it was to a degree after the fact. And it also, though, assumes that somebody would, that Daniel specifically, would have known what 1032 meant. 1032 is a kind of a very, very vague, general, and to a lot of viewers, probably meaningless thing to say. So again, I think that there are certain inferences or assumptions that have to be made there to assume that that actually contributed to his knowledge. And as far as the handcuffing, again, I believe that that occurred after the conduct had already been committed. Two of the other cases that were cited in Daniel's brief, Wydra and Thigpen, again, include the same kind of element. So in Wydra, there were emergency lights, there were sirens activated, an officer announced himself as such, and the court noted that it was light enough for the defendant to see the uniforms and he'd reach for their holstered guns. So all these things, again, combined to show that he actually knew that they were officers. And then in Thigpen, again, marked police car, sirens and emergency lights, the officer in question's in full uniform. He announced his office, stood face to face with the defendant. So the court found, quote, paragraph 26 of Thigpen, Thigpen viewed standing in front of him in his, quote, police uniform. Again, those are all, so all of these cases have this combination of facts that led directly to the conclusion that the defendant knew that he was dealing with police officers. Again, a combination of that they announced themselves, that they were in uniform, that there were indications that he'd specifically seen them in uniform. We found no cases, and the state presented none, where knowledge was found based on mere speculation that the officers were in uniform and speculation that he was, that they were observed to be in uniform. It's true that mental states generally inferred from the surrounding circumstances, but the state still has to present sufficient evidence from which an inference of knowledge can be made. And that inference has to be based on established facts, not pyramid on intervening inferences. Courts have also, courts have also phrased it that the state cannot leave to conjecture or assumption or even inference an essential element of the crime. It has to be proven. The state here presented no direct evidence that Klausten, sorry, that Daniel knew Klausten's don't work police officers. They haven't even presented evidence from which that directly follows. There has to be this series of pyramiding inferences before one can come to that conclusion. Well, in the stipulation, the court also heard a recitation of when the officers approached, Ledstow moved his arms close to his side, felt for his waistband and grabbed onto his the police vehicle, the vehicle that the two officer, that officer Klausten arrived in when he responded to the 911 call for aid. I guess a dispatch indicated that a caller had called in the fact that there was a verbal argument going on outside. So that's what he was responding to. And so it seems to me that when the court heard that, it certainly could infer that Ledstow would have seen, I mean, why would he have moved his hands close to his body in order to, and felt for his waistband if he didn't have a weapon, if he wasn't afraid of the two people who were dressed as the police coming after him. Well, judge, to address the first part of that, I'm sorry. Okay. To address the first part of that, the, uh, I think that it is, that it is not clear that the, either that the officers arrived in the police car, uh, or that that's the vehicle that they were referring to. Now we all know more facts than are actually in evidence here because, uh, there are additional facts that were in this suppression hearing and so on. I think the overall facts make it slightly ambiguous, whether the officers arrived in foot or on car from the first place that they arrived at. But, um, and the other, the other facts do make it clear that there were two vehicles in question that, that they, that Daniel and, uh, and the, uh, the alleged victim here were standing by a vehicle and that Daniel walked to another vehicle. Again, none of that actually is, is in evidence. I think that, um, what actually, but, but that makes it very questionable what the vehicle is. It makes it sound like Daniel's actually just walking from the vehicle where he's standing arguing with his girlfriend to another vehicle. Um, as, as far as the other aspect of him, uh, reaching for his waistband and putting his arms close to him. Again, I think that in the absence of anything else, in the absence of an assumption that this was reactive behavior in the first place, you've described simply somebody hitching up his pants, somebody doing something that is perfectly ordinary and, and, and, and not, uh, uh, and not necessarily suspicious and not without certain other assumptions. If you describe that without other attended circumstances, that wouldn't automatically lead one to believe that suspicious behavior occurred. Mr. O'Brien, uh, uh, your client did stipulate to, uh, the exhibits, correct? Yes. And one of the exhibits is a picture of the officer standing in front of the marked, um, police vehicle, is that correct? Correct. Well, since you stipulated to that, to the admission of that, uh, photograph, uh, why is it a reasonable inference that that vehicle is the vehicle that the officer arrived in? And as we've already, I think, agreed, it is a marked vehicle. Judge, I think there's a couple of things there. First, uh, the, uh, that could just as easily, or perhaps, perhaps the even more reasonable inference is that at the very least that was taken care of and, uh, got a camera. I'm looking at the exhibit. It clearly was not taken at a police station. Well, again, and I also don't think though that it matches the surroundings, uh, that were described Daniel and, um, uh, and, and again, the alleged victim here were described as standing in an open field and there's clearly a building, uh, directly next to, to the vehicle in the picture. So I think that based on all that it's reasonable to, to infer that the picture was in fact taken, uh, at another location. Well, I think you got to live with your stipulation, just like the state has to live with theirs, which was a little lacking, we'll say, uh, without any question. But, um, to me, you stipulate to this photograph, photograph shows the officers got the pants, leg rolled up and then there's other photographs to show the injury. Uh, and he's in front of a vehicle, uh, that is marked. Uh, it seems to me that a reasonable track fire track fine. Let me try that again. In fact, finder could, uh, conclude that the officer wasn't in uniform. The officer did arrive in a marked police vehicle and, uh, it's not a very, uh, far leaped and then suggested defendant was aware of all that. Anyway, that's kind of what I think your hurdle is. I guess that's not really a question, but you can address it if you'd like. Good job. Again, I just would know that, that I think that there's enough other factors there that make it, um, very questionable. Uh, um, not necessarily entirely implausible that, that that's the case, but that make other, other, uh, possibilities just as likely. And in some cases, even more likely again, particularly the presence of a building there and, um, and just the, uh, the, the circumstances that, that would perhaps make it unlikely that Daniel, sorry, that, that Klausen and stone would have been engaged in this picture-taking process at the scene of the crime, uh, at the time of the arrest. So they're dealing with somebody who had a gun, who, who, who was being, um, uh, difficult and obstructing a police officer. Um, and, uh, they, uh, there's no mention of any other officers there. It seems very reasonable to assume that this actually occurred later again, at the very least after they got back to the police station. Well, when it comes to inferences, isn't it most reasonable to infer that they took their picture once sort of clearing the scene with the defendant while they're both still there that night, isn't that more plausible than it happened in somewhere else? I think anything's possible. There is more a question of when they had the opportunity and when it occurred to them, uh, it's just, uh, again, it's certainly not implausible that they would have taken the picture when they got back to the station, but I would just come to the fact again, that the state bears the burden of proof here. They have to put on the facts from which the, uh, the evidence, uh, from which the, sorry, the inferences can be drawn and, and, uh, they, they similarly bear the consequences of any omission of proof. So if, if, if nobody else has any further questions, thank you. I don't see any questions, but you will have rebuttal. Mr. Gatton, we may proceed with your argument. Hey, please, the court, counsel, my name is Connor Gatton and I represent the state in this matter. As an initial matter, I would just like to point out that in reviewing the sufficiency of the evidence, the reviewing court must look at the evidence in the light most favorable to the state and draw any reasonable inferences, uh, there from the evidence in favor of the state. Uh, I think that, um, as we've gone over the stipulated facts, uh, may have not been, uh, as robust as they could have been, but nonetheless, I believe that they are sufficient to prove that defendant knew that the police officers were police officers, uh, that they were in uniform and that he was aware of their, uh, being in uniform. Um, the photos that were entered into evidence, uh, show that the wound is fresh and this, but it's, it's still kind of bleeding. It's wet. It's not dry. Um, this support supports the inference that the photographs were taken, uh, immediately after the incident in question and that the were in uniform at the time they encountered the defendant. Uh, and then as for the, uh, contingent that defendant was not aware that they were police officers or did not see them, I think based on his behavior, it's a reasonable inference to conclude that he was, he saw uniformed police officers. They, uh, approached him. He turned away from them. They commanded him to stop multiple times. Um, and then they grabbed him. So I got to stop you there. You say that, um, they approached him and he turned away, uh, from the officers. That's not in the stipulation, is it? No, I'm sorry. I misspoke here. Okay. And I do think, uh, and council pointed this out. Um, you got to be careful in your facts and this is not to pick on you at all, but, uh, if you're giving facts that actually was, uh, facts that were, um, uncovered at the suppression hearing, but not in the stipulation, though, you have to be careful not to include those just for future reference. And it brings us back to what I just said, said a minute ago, you seem to be arguing something that unfortunately is not in the stipulation. Unfortunately, from your standpoint is that the officers, um, they very well may have approached him and he turned away, but that is not in the stipulation. Just to clarify. Am I right? Yes, your honor. I apologize. That's okay. And I know you didn't give this stipulation, but sure. Wouldn't have been very hard for the state to say that part of the stipulations that the, uh, uh, patrol officers were in uniform and did arrive in, uh, a vehicle that was clearly marked. And, uh, since it was in writing and they had time to think about it, it just seems really strange that they failed to include that given what the charge was in this case. But I'm just rambling on because I don't expect you to respond to that. Please continue. I, I just think that if you look at the totality of defendant's behavior, even after the initial, uh, walking away, um, you know, he's grabbed, he continues to repeat, he's grabbed and there's a struggle. Uh, he pulls away multiple times. I think that it's reasonable. It's a reason to include that at some point during these multiple acts of resistance that he would have been aware that he would have looked upon and been aware of the officers. And, um, did he continue to pull away after one of the officers said 10 32, which means the presence of a gun? Yeah, I think that certainly adds, um, makes it more likely that he should have been aware, uh, that they were officers. Well, my question is after he heard the expression 10 32, did he continue to resist or was the resistance already done at that time? I believe that he continued to resist afterwards. I believe in the stipulated facts that, uh, it says that one of the officers attempted to like reach for the gun and that he continued to pull away or struggle. I don't have the exact verbiage in front of me and I apologize for that. Okay. Please continue. Um, that's about all I have. I believe that those two inferences are sufficient to support the state's burden. Uh, and, um, I would respectfully ask that this court affirm defendants conviction unless you, you have any more questions for me. Justices, any questions before we turn it back to rebuttal? I see none. So, uh, is there any rebuttal Mr. O'Brien? Just, um, briefly, your honor. First again, I would note that again, the state characterized the wound is, uh, fresh and, uh, I believe here they described it as wet. Whereas in the brief, described as actively bleeding. I think wet is probably a more accurate description of what was actually in the picture. And, um, but again, I think that that leads to a slight, some slightly more, slightly more ambiguity about when the photograph was actually taken. So some question about was this actually immediately after they got back to the station or sometime later, I also just believe that the totality of this, uh, of the defendant's behavior, again, as, as referenced by the state there, I think that, uh, that when you break it down, that, that no aspect of the defendant's behavior is actually suspicious, uh, or in and of itself, indicative of responding to the presence of a police officer. I think that certain inferences or assumptions have to be drawn to get to that point. Oh, but what about the time during this and he pulled his hands away. He was actively resisting at that time. Isn't that correct? I mean, the stipulation indicates, uh, specifically, um, after I'm paraphrasing here after he walked up to the vehicle, tried to open the door and then it says officer Klauston grabbed Blesdo's arm, at which point Blesdo tensed his muscles and tried to pull away. A brief struggle ensued at which time officer Stone grabbed him as well during the struggle. Officer Stone said 1032 meaning firearm. At that time, officer Klauston tried to pull Blesdo's arm upward and handcuff him. Blesdo eventually was subdued and handcuffed. And then they, the stipulation goes on to talk about the recovery of the, uh, uh, the handgun. Again, there judge, I believe that the, uh, that it's ambiguous as to whether the struggle continued after that point. I think that the way that, excuse me, after, after what point? After the, after he said 1032 and then, uh, tried to grab his arm and handcuff it because it says, well, eventually subdued. That certainly implies that it went on, that it didn't stop right there. Otherwise there wouldn't have been the next sentence. Correct. But again, judge, I don't believe that it necessarily explicitly points to any conduct of his that occurred after that point. Um, more importantly though, I would just suggest that the 1032 itself, uh, and possibly even the handcuffs aren't necessarily dispositive of him knowing anything. If again, he's not aware what 1032 means. And if he is, if he's not observing the officers, they may have grabbed his arm to handcuff him. As far as Daniel knows, he's still being grabbed by two people from behind. Who are trying to handcuff him? People on the street? Bystanders? Well, again, I'm not necessarily sure that he would have been aware of that if he hadn't observed. I guess as, as justice Kavanaugh mentioned earlier, I think we have to, we have to use common sense, but in assuming or thinking about what the trial court was able to have, um, strangers on the street, panhandlers or, um, or anybody else try to handcuff somebody. I mean, they might try to subdue him in some way or take them to the ground, but not with handcuffs. Right. Again, I just, I think that an assumption is required regarding his knowledge or awareness of the fact that they were trying to handcuff him. If in fact he didn't observe them. And I have nothing further in rebuttal. If there's no further questions. I see no further questions. Thanks to both of you for your arguments. The case is now submitted and court stands in recess.